Good morning. Devin Burstein, Federal Defenders, on behalf of Mr. Casillas. Mr. Casillas unambiguously invoked his right to remain silent, and he did so twice. Officer Sanchez asked him, do you wish to speak with the officers? And Mr. Casillas replied, I have nothing to, well I don't, the only thing is that I'm sorry and I apologize. And then Officer Sanchez says, continue. What he wants to know, referring to the other agents, what he wants to know is if you wish to speak with them right now. And Mr. Casillas, shaking his head in a clear no motion, said, I have nothing to talk to them about. Nothing. Thank you. Now in Miranda, we learn that if an individual indicates in any manner, and they use the must mean both verbally, nonverbal communication, but in any manner, at any time prior or during to questioning, that he wishes to remain silent, the interrogation must cease. And any statements taken after the person invokes his privilege cannot be other than the product of compulsion, subtle or otherwise. Now this Court has held that an invocation must be unambiguous, but in Arnold, the Court was clear that a suspect need not speak with the discrimination of an Oxford Don. Rather, the words of the request will be understood as ordinary people would understand them. And neither this Court nor the Supreme Court, quoting from the Anbang decision in Anderson, have required a suspect to use words any more technically worded than I have nothing to say. And in Bushyhead, this Court held that I have nothing to say, I'm I have nothing to say, and that entire statement was an invocation of the right to remain silent. Now here, we have, I have, just taking the second invocation, I have nothing to talk to him about nothing, in direct response to what he wants to know is if you wish to speak with him right now. Now to suggest that that is not an unambiguous invocation strains reason. To try to draw a distinction between I have nothing to say and I have nothing to talk to him about, thank you, is really a distinction without difference. Here's a man that we know is not a sophisticated man. He's a man with an IQ of 67. He's asked a direct question, shaking his head in the universal sign, no matter what language you speak, for no, I have nothing to say to them. Nothing. Thank you. At that point, it's clear what should have happened. Miranda dictates, and every case following in this Court, in the Supreme Court dictates, the interrogation should have ceased. We must scrupulously honor the invocation of the Fifth Amendment. Did Mr. Casillas testify at the trial? No. He did not testify. So the only opportunity the jury had to hear from him was when the transcript and the videotaped interview, which I hope Your Honors have had a chance to watch, that was the only chance, and we know that that was critical because there was one jury note, and the jury note asked to re-watch the confession. Indeed, during the rebuttal closing itself, I think the government used the word confession approximately 16 times, saying that, you know, the best, essentially, in words and substance, the best evidence came right out of Mr. Casillas' mouth. Now, we've raised a whole host of other issues regarding voluntariness. There is an explicit threat here that Mr. Casillas' failure to cooperate would be communicated further in the report, and that the agents would suggest that they throw the book at him. And it's our position that Officer Sanchez was really far afield here. Let me ask you, this is an issue that's caught my eye. What can police officers say about cooperation? Can they say, we'll bring your cooperation to the attention of the judge? Right. That's the distinction Harrison draws. Harrison talks about it in terms of two sides of the same coin. One side being cooperation can help you, and that's been deemed permissible. But Harrison is very clear and explicit that the other side of the coin is not, because what the other side of the coin is saying, in Harrison, it wasn't even a direct threat for more time. It was, the conduct there was the suggestion that Ms. Harrison hadn't communicated, hadn't cooperated, would be given to the court. And what the court said about that is, you can't put a penalty on the exercise of the Fifth Amendment. That's what's, that's the critical distinction. We can offer you a carrot, and indeed, we do offer you a carrot if you cooperate in some instances. But we can't say that if you don't cooperate, things are going to be worse. Can you say, can you say if you cooperate, you are likely to get the acceptance of responsibility reduction? Perhaps. That would be a, that would be a possibility. Can you say if you don't cooperate, you won't get the acceptance of responsibility reduction? No, you cannot. A, that would be affirmatively misleading, because that's not always the case. In fact, that is certainly not the case, because a number of times, people have invoked their rights or made silent. They get indicted, agree to a fast-track plea agreement, plead guilty, and as a routine matter, they get acceptance of responsibility. So we know that that would be affirmatively misleading. And this court is very clear that we're not going to tolerate affirmatively misleading statements in, to coerce somebody to invoke their, to give up their right to remain silent. So in that case, I don't think that would be permissible. And it also, again, it puts a penalty on invoking the right to remain silent. And that is everybody's right to invoke. So we don't want the government, we don't want to incentivize this kind of bad police conduct. And so that's the line Harrison draws, and I think it's pretty well established at this point. So Officer Sanchez was both, was acting both as the, an interrogating officer and as the translator? There were two principal interrogating ICE agents. They brought in Officer Sanchez as the interpreter, but as your Honor is, I'm sure, aware from reading the transcript, he goes off quite a bit on his own. Well, that's the part that bothers me, because it brings to mind the duty case, where he said, particularly the statement where he says, remember that everything you help with and everything is going to be to your benefit, not theirs. And then it goes on and on, and then he says, as a fellow countryman, I recommend that you speak to them. Right. And to me, that seems to undermine, directly undermine the part of Miranda that says that anything that you say here can be used against you in court. Because that would not be in his benefit. I agree, your Honor. It reminds me directly of the Hart case, which I cited to you. It is an 11th Circuit case, but there the court, I think the reasoning is solid from the 11th Circuit. Telling a suspect that honesty wouldn't hurt him contradicted the warning that anything he said could be used against him. And that's what we have here. By telling Mr. Casillas that everything you say, everything is going to be to your benefit, I cannot, it's troubling to think of a more directly contrary statement to everything you say is going to be used against you. So what was Sanchez doing? I mean, the other two interrogating officers gave correct warnings. And then Sanchez just goes rogue with this stuff? I think we can see from the end of the videotape what he was doing. He really wants this job being called in to be an interpreter. He talks about getting a raise and getting kind of pulled off the line. He talks about hitting them where it hurts. And that's in the transcript, in the video you have. He talks about, and I think we can see his motivation there. He doesn't want to fail to get a confession. He's going to do what it takes to get a confession, because he likes this job. I assume he's being pulled in off the primary or secondary or something. And he, you know, it references one he did earlier with a woman who was crying and I think they mentioned her children. I don't know that case. I only know what's in our record. But, Your Honors, whether you rule on the clear and unambiguous indications or you rule on the threat or judge Wardlaw's concern about the misadvisals, the result is the same. This statement should have been suppressed. Mr. Casillas' conviction should be vacated and the matter remanded with an order to suppress. You see, I have five minutes. If there's no questions, I'd save it for rebuttal. Thank you, Mr. Burstein. Thank you, Your Honor. Good morning. Good morning. And may it please the Court, Mr. Burstein, good morning. Hamilton Aronson on behalf of the United States. I'd like to start by acknowledging some of the things that Judge Wardlaw talked about and say that there's no doubt that there were some problematic statements in this case. As Judge Lorenz indicated in his ruling, this was a close call. That's what he said. And he was right. And he said he wouldn't be surprised if we reversed him. He did. Maybe it's a more unfortunate statement than the fact that it was a close call. But Judge Lorenz has been able to submit that he got this one right. It was a close call, but he got it right. And I want to start where we ended, where you ended with Mr. Burstein. I respectfully think this case is very different from the duty case. And I know that was an en banc case and Judge Wardlaw, I know you were on that case. But in that case, you'll recall that it involved a young man and there was relentless questioning, 13 hours, overnight, with, you know, with two agents sort of tag-teaming this young boy. And with the particular problem of... The key thing was that the subsequent advisals directly undermined the correct Miranda advisals. And that's how I see this case as analogous. I agree with that. But I think that the difference is in that case, they directly misadvised him about his right to counsel. They told this man, this young man, that the right to counsel only applies if you are involved in the offense. You know, they directly contradicted... If you committed the crime, then you have the right to... Yeah, if you committed the crime, you have the right to an attorney. Correct. And that's not what happened here. You know, if you look at the transcript, the sort of... The transgression is as follows, or the progression is as follows. The agents advised him properly of his rights. And, you know, they advised him of his rights to remain silent, of his rights to an attorney. And they even advised him, although we know after Laura Valdez it's not required, of his right to stop the questioning. And after each right, if you watch the video, and I would strongly encourage you if you haven't to do that, because there's a lot of stuff that comes through in the actual video that does not come through from the cold transcript. After each right, they ask him if he understands, and if he says yes, he initials. And this is very different from, for example, Harrison, where we have a sort of misadvisal going to the waiver. In this case, Mr. Casillas has already waived his rights at the time of the majority of the statements that Mr. Casillas made. And Mr. Burstein complains about an error on a reference. And if you look on the transcript, it's at 156 of the transcript. There are some questions that Mr. Casillas has after he indicates that he apologizes and that he may not want to talk to the agents about everything. And we'll come back to that at the end. But he says, the agent does what I hope that we would expect every agent to do. When he gets that ambiguous invocation, he says, just like in she, he was supposed to she, well, I want you to read him this advisal again. Take him back to the advisal, and this is what he says when he goes back to the advisal. What I need for him to do is read the second section here and see if, well, make sure he understands this. And if he does, if he's okay with us asking him questions, then we can proceed. So Mr. Sanchez then goes through the form with him, and then at the end of that section, he asks him two more times, do you understand, before he waives his rights. Sanchez says, do you understand, or should I explain it to you again? Mr. Casillas, no, it's all right. Officer Sanchez, do you have any questions about that? Mr. Casillas, no. And then he proceeds to sign the waiver. And while the defense sort of suggested that the agents had directed him to sign, if you watch the video, that's not what happens. He asks twice if he understands, and then he picks up the pen and he's looking for the place to sign. And Officer Sanchez shows him where to sign. It says print and sign here. You know, I did see the video, and I'll grant you that it looks more benign when you watch it than it does in black and white on the page. I'm hung up with telling the guy, if you don't make a statement, we're going to have the judge throw the book at you. I agree, and that's the portion of the transcript that I agree is the most problematic. It's for the government, and it begins on, it's 158. Why isn't that the end of the case? I'm sorry? Why isn't that the dispositive factor? Well, I think there's a couple things to keep in mind about Mr. Sanchez's comments. And as I indicated in the beginning, there's no doubt that there's some problematic statements in here. But there are a couple things to remember. The first is, as we know from Preston and some of these other cases, while police tactics are one factor, and they're a necessary factor in order to find a statement involuntary, they're not the only factor. There are a number of cases, Bautista-Avila, Preston, Wanda v. Allen, where the court says whatever coercive tactics there might be, they weren't enough to overcome the suspect's will. And we need to look at the other circumstances in the case. And I would submit to you that that's particularly true in this case, where we have one or two comments that comprise maybe a 45-second portion of this one-hour interview. And all of the other factors that the courts look at for voluntariness cut in favor, right? It's in his native dialect. You know, it's not like the Garibay case where they question him in English even though he only speaks Spanish. It's in his native dialect. It's in an interview room. It's not in a cell. The agents are unarmed. He's not handcuffed. And if you watch the interview, he's calm. In fact, at one point in the interview, you can tell that he's not being coerced. Okay, so we know that you can waive your Miranda rights and then you can revoke your waiver and change your mind any time, right? And let's assume you're correct that the waiver was adequate at that point. Why was it necessary for Sanchez to then threaten him and go on and on and on with all these other statements if the officers believed that he had truly and firmly waived his rights and wasn't going to change his mind? Yeah, I mean, I think to say that it's necessary would not be accurate. I don't think it was necessary. Right, why would he even do it? It seems like if they really believed he had made a waiver that he was not, a full waiver that he was not going to back off of, why would Sanchez go on and do all this icing on the cake step that crosses the line? Yeah, I agree. Certainly those statements were problematic, and no one knows why, but I think you get a little bit of an insight into what Sanchez was doing when you look at the fact that his sort of, I guess the diatribe, as the defense would call it, on those two pages, 158 and 159, are interspersed with proper statements of the law that sort of suggest that he's trying to get Mr. Casillas to tell the truth. Trying to get him to talk more. Yeah, I think he's trying to get him to tell the truth. While he does say that everything's going to be in your favor and that they're going to throw the book at you, he also talks about those things in the context of cooperating and telling the truth. He says, they don't promise you anything in return, that's on page 158, and don't be afraid to stop the questions, and this right belongs only to you. And then if you look at the end of the transcript where, as Mr. Bernstein says, he does make some sort of unfortunate comments about, you know, hitting suspects in the soft spot, but that is all in the context of the acceptance of responsibility points. And you can see Officer Sanchez at the end say, hey, I've seen this before, they get points if they cooperate. You know, it really does work. So that doesn't excuse the more problematic comments, but I think it does sort of give you an insight into Officer Sanchez's mind that, you know, he's not sort of out there trying to be a jerk to Mr. Casillas. You know, I think he thought that if Mr. Casillas told the truth and cooperated, that he would get the benefit at the end of the day. What's this fellow countryman business coming in? I mean, it's just very, I don't know. Unseemly. Yeah, and it seems as though that this was wrong and that the ICE agents ought to know this is wrong and the only way they're going to know this is wrong is if the confession is excluded. Well, I think that certainly those statements are, it is unseemly. I think by saying my fellow countryman, he is trying to sort of befriend Mr. Casillas. But, again, two things that I think are important. One, even though we have those problematic statements, all of the other factors about volunteering this, support of finding out it was voluntary. But more important, case law is very clear that whatever the tactics might be, at the end of the day, our job is to determine, was he actually coerced? Did it overcome his free will, unrestrained intellect? And if you watch the video, it's clear that it didn't. And, in fact, it's somewhat ironic that after this one diatribe that is supposedly so coercive and so, you know, is overcoming his will, does he confess? No. He gets two deny knowledge statements that the defense wanted to get in a trial and that we agreed to let in by playing the entire videotape so that the defendant wouldn't have to testify. So he didn't confess, you know, until 30 minutes later. The other thing that's very, very interesting is that, you know, to suggest that this defendant was, you know, coerced into speaking, that it wasn't his free will, that he's so unintelligent that he could have been manipulated, at the end, when he's talking about the money, this is on page 198 of the excerpt, the agents say, you know, Mr. Sanchez, or Mr. Casillas, $2,000 was a lot of money for what you were doing. And this is what he says. A lot of money? $2,000? Please, $2,000. That's nothing. And he looks at the agents with the look of just being incredulous. And you can see that on the video. So I think it's really important that, you know, we don't just look at these facts in a vacuum and say, well, we've got some good facts, we've got some bad facts, you know, what do these other cases say? We really need to get to the heart of the matter, which, was Mr. Casillas actually coerced? You know? And if you look at his demeanor during the interview, you know, he's sitting in his chair, he's got his jacket on, he's very calm, he's not sweating, the agents don't yell at him, they never put their hands on him. You know, when you look at some of the cases where you find an involuntary statement, you know, these, like duty, where they just relentlessly interrogate this juvenile for 13 hours, you know, overnight and tell him that his right to counsel doesn't apply. You know? In some of these other cases where, you know, suspects are beaten or their family is threatened, you know, like in Tingle. That's just far, that's far different from what we have here. Suppose we disagree with you and decide that the confession should have been suppressed. Is there any way we can construe this as harmless? No. My position is that we could not in good faith ask this court to find this harmless error. And I think what Mr. Burstein said is very critical. You know, there may be cases where a confession, there could be harmless error, if a confession were admitted. But you'll recall, and Mr. Burstein mentioned this, when the jury was deliberating for a few hours, they had a note, they watched the statement again. And it did include the two deny knowledge portions, which the government agreed to offer in our case in chief, and the defendant didn't have to testify. But it did include the confession, and a very short time later the jury came back. So in good faith, we're not asking, we would not ask that. So do you have, if you were to retry Mr. Casillas, do you have evidence, other evidence that you could put on? Yeah, I would say that the evidence was strong in the case. He was the driver and still locked him out of the car. There was a compartment. And this also, I think, goes to this argument that he's very unintelligent. You know, he clearly is intelligent. At the primary booth, they asked him where he was going, and he didn't say anything. He just showed this bloody napkin to try to, you know, get through like he had been to the dentist. Then in secondary, he's conniving again. You know, they ask him, you know, some routine questions. And he says, well, I'm a security guard. You know, can you let me through? I'm a security guard. And, in fact, he's so nervous that he drops his ID on the ground. And there's also evidence that, you know, he had crossed many times in the past. And so sort of the suggestion that he was so unintelligent that he was duped into, you know, confessing or that he didn't know the drugs were in there I think would be a tough argument. You know, and it's particularly true when you think about the fact that in order to be a security guard, there was a 45-question exam that he had to take. He had to get 100 percent accuracy. He had to take, you know, hours and hours of training to keep that card current. And, in fact, it was current when he came to the port of entry. He had a tear gas certificate, which requires two hours of training. He had a driver's. His registration was in his name, the proper address. He had current insurance. This wasn't a man who, you know, was so unintelligent that he, you know, didn't know how to do things. Well, what do you make of Dr. Yanofsky's report? Well, I think, you know, Dr. Yanofsky was the defense expert. And he interviewed the defendant. And we don't disagree that he was at the lower end of the intelligence of the IQ scale. But, you know, when you're talking about, you know, whether someone, the intelligence required to knowingly smuggle drugs or, in this case, you know, provide a valid confession, you know, he certainly had sufficient intelligence for that. And, you know, there are some cases directly on point where they talk about the mental health issue. And, for example, in I think it was Juan v. Allen, there was some deception. The agent said that, you know, the intelligence wasn't sufficient. And I'm sorry, Batista Avala. Defendant's mental capacity, while low, was not so low that it could invalidate his waiver. And one other thing that's important about that, there are a number of cases that talk about the fact, and this is including Xi, that, and Burkvist, actually, the new case in the Supreme Court, a defendant's indication that they understand their rights is very strong evidence of a valid waiver. And that's what we have in this case. We have these agents going through their rights with Mr. Casillas. He's indicating that he understands the rights. And then he waives his rights. And very important to remember that, again, these comments, and they're, again, problematic, but they're very narrow in scope compared to this one-hour interview. They're interspersed with accurate statements of the law. And, again, they come after the waiver. And if you watch the video, you'll clearly see that Mr. Casillas is not coerced into this waiver. So we respectfully submit that, while it was a close call, that the court got it right. There wasn't an unambiguous request for counsel. His Miranda rights were explained to him. And he validly waived them. And the confession was not coerced. So I know I didn't get to talk about the unambiguous indication. Does the Court have any questions? Otherwise, I'll submit. Thank you, Mr. Harrison. Thank you very much. First Dean, you get the last word, if you want to. Thank you, Your Honor. And if it pleases the Court, I'll just let my last word be the word from Harrison. The government argues that when viewed in context of all the circumstances, the agent's questions did not overbear Harrison's will. The government points out that Harrison was not in jail or a police station but in her own home. She was 31. She had education. She was familiar with the criminal justice system. We do not ignore the record. But there are no, this is the Court's italicis, there are no circumstances in which law enforcement officers may suggest that the exercise of the right to remain silent may result in harsher treatment by a court or a prosecutor. The admissibility of a confession turns as much on whether the techniques for extracting the statement as applied to this suspect are compatible with a system that presumes innocence and ensures that a conviction will not be secured by inquisitorial means as on whether the defendant's will was in fact overborne. If there's no further questions, I'd submit. First Dean, thank you, Mr. Harrison. Thank you to the case just argued. Mr. Harrison, I just want to say I found your candor very refreshing. I wish the externs had been in here to see it and emulate it. Thank you. Excellent argument by both of you. Thank you.
judges: Cedarbaum, Silverman, Wardlaw